Harper *vs.* Scott.

No. 24.—JOSEPH HARPER, plaintiff in error, *vs.* JOHN SCOTT, defendant in error.

[1.] An ante-nuptial settlement, which was, by agreement between all the parties interested under it, after the marriage, extinguished, and the property named in it divided and delivered, cannot constitute a consideration for a subsequent conveyance, by the husband to the wife, of the property received by him under such division.

[2.] A voluntary conveyance by a husband to his wife, of slaves, is within the spirit of the Statute *27th Elizabeth,* and void as against subsequent *bona fide* purchasers without notice.

[3.] Such conveyance is also void as against subsequent *bona fide* purchasers without notice, upon Common Law principles.

[4.] In order to the introduction of secondary evidence of the contents of a lost paper, it is only necessary to establish a reasonable presumption of its loss or destruction; and this presumption is held to be established, when the party shows that in a reasonable degree, he has exhausted all the sources of information and means of discovery, which the nature of the case suggests, and which were accessible to him.

[5.] The sayings of a deceased person, relative to her seizure and disposition of a lost paper, held to be admissible to prove presumption of loss or destruction.

[6.] In an action of trover, a person who has sued out a possessory warrant for the property, against the plaintiff, and given bond under the Statute, to have the property forthcoming, to answer a judgment for the same, held to be an incompetent witness for the defendant.

[7.] A surety on such bond with other sureties, cannot be removed from the bond by the Court, with a view to make him a competent witness in the suit, upon an offer to substitute another security in his place, without the consent of his co-sureties.

Trover, in Houston Superior Court. Tried before Judge Johnson, presiding for Judge Powers. April Term, 1852.

The record discloses these facts. In 1836, James Hudson intermarried with Sarah Walden. She was a widow, with two sons, by a former marriage, to wit: Joseph Harper and Jesse Harper, and possessed thirteen slaves and several lots of land. Prior to their marriage, they entered into an agreement in reference to her property, of which the following is a copy :

" GEORGIA, Houston County :

*Know all men by these presents*, that whereas, James Hudson and Sarah Walden, both of the State and County aforesaid, agree to marry ; and the said James Hudson, do agree on his part, that all the negroes, thirteen in number, and four lots of land, Nos. 49, 50, 29, and 30, be hers her lifetime, and then to belong to her two sons, Joseph Harper and Jesse Harper, in case there is no issue between them ; if there is, then all to belong to it. And I, Sarah Walden, do agree on my part, that James Hudson, do have all that he can make off of them her lifetime, if he survives her ; and she, the said Sarah, further agrees not to claim any part of the property belonging to said James Hudson."

The above agreement, entered into on the 10th day of January, 1836, and signed by the above named parties, and witnessed by the Rev. Samuel Anthony. Witness, we do both agree that the above is a true copy of the original, which is lost or mislaid, and cannot be found.

JAMES HUDSON.
her
SARAH × HUDSON.
mark.

In 1837, at the instance of Mrs. Hudson and the defendant, Joseph Harper, this marriage agreement was revoked ; and in lieu thereof, all the parties in interest, agreed that the property

should be divided into three equal parts—one-third to each of the two Harpers, Joseph and Jesse; and the other third to James Hudson, to wit: a negro man, woman, and her increase (which are subject-matter of this action,) in fee simple.

In 1842, James Hudson executed the following instrument. After giving a copy of the original agreement between himself and his wife, Sarah Hudson, he proceeds:

" My beloved wife, having (many, some or from,) just causes become afraid that she will be deprived of her just dues and support, out of her property, above named, I, James Hudson, do hereby relinquish to her, all my claims to her property, as above named, that [may be, was left,] in my hands, and all that part of the stock and household furniture that was hers.

Signed and sealed, this 23d April, 1842.

JAMES HUDSON."

On the 20th February, 1849, James Hudson sold the negroes in dispute, and which had been awarded to him under the agreement of 1837, to John Scott.

Subsequently to this sale, Thomas J. Harper, as the " *prochien ami*," of Mrs. Hudson, sued out a possessory warrant against Scott; at the hearing of which, the Justices awarded the possession of the negroes to Thomas J. Harper, as the next friend of Mrs. Hudson.

Scott then brought an action of trover, for the recovery of the negroes, against Joseph Harper, in whose possession he found them.

On the trial, plaintiff, in order to lay the foundation for introducing secondary evidence as to the agreement between James Hudson, Mrs. Hudson, and the Harpers, by which one-third of the property was given to James Hudson, in fee simple, examined Charles F. Hudson and Henry A. Scott, as witnesses.

Charles F. Hudson, sworn—" There was a settlement between James Hudson and wife, and Joseph and Jesse Harper, made at the instance of Mrs. Hudson and the Harpers; the trunk containing the instrument was broken open; I heard Mrs.

Hudson say she had the instrument taken out of the trunk, and that her husband would never see it again."

Henry A. Scott, sworn—" He was son of the plaintiff; did much of his writing; examined his papers frequently in the general course of his business;. never had seen such a paper; his father is now sick, and unable to attend Court; Mrs. Hudson after her separation from her husband, went to defendant's house, and carried her trunks and clothes; she died at defendant's house, since the suit was brought."

The Court then overruled the objection made by counsel for defendant, and allowed the evidence of Charles F. Hudson,·including the sayings of Mrs. Hudson, to go to the Jury, and defendant excepted.

In the progress of the trial, the defendant offered Thomas J. Harper as a witness, " to prove that defendant was not in possession of the property at the time the demand was made, but that it was in the possession of Sarah Hudson or of himself, as the next friend of the said Sarah Hudson."

Plaintiff objected to the witness, on the ground that he was interested in the result of the suit.

The Court sustained the objection, and defendant excepted.

The defendant moved the Court to permit him to give other bail, in lieu of Jacob N. Goff, one of his securities on the bond for the forthcoming of the negroes, who was a material witness for the defendant—there being two other securities to said bond.

The Court refused to allow the substitution to be made, unless the assent of the other securities was first obtained. The Court offered, at the same time, to allow the defendant to substitute a new bond; the defendant failed to obtain such consent or to substitute a new bond; and defendant excepted to the ruling of the Court.

Exceptions were filed by the defendant, to the charge and refusals to charge of the Court, which the decision of this Court renders it unnecessary to set out in full.

Upon these several exceptions, errors are assigned.

Poe & Hunter, for plaintiff in error.

Stubbs, Whittle & Hall, for defendant in error.

*By the Court.*—Nisbet, J. delivering the opinion.

[1.] The questions made on the instructions of the Court, relative to the instrument executed by James Hudson, in 1842, and on the Court's refusal to instruct as requested by counsel for the defendant, are mainly relied upon for a re-hearing, and are first to be considered. In 1836, James Hudson, being about to enter into matrimony with Mrs. Sarah Walden, made with her a settlement, in which it was stipulated on his part, that the property which she then owned, consisting of some thirteen negroes, and several lots of land, should be her's for her lifetime, and at her death to belong to her two sons, by her first marriage, Joseph and Jesse Harper, in case there should be no issue of the marriage, and if there should be, then the property should go to the issue. It was stipulated on her part, that he should have all that he could make off this property during her life, if he survived her; and that she would not claim any part of the property belonging to him. The marriage was consummated; and in 1837, some of the parties, as it would seem, being dissatisfied with the condition of things, they all came together, and at the instance of Mrs. Hudson and her two sons, Joseph and Jesse Harper, divided the property thus previously settled upon her; she consenting to part with her life interest— he with the profits he could make off the property, and the two Harpers with their remainder in fee of the whole property, in consideration that James Hudson should have one-third of the property, and each of the Harpers one-third, in immediate fee simple. In pursuance of this arrangement, the Harpers took into possession, each his respective third, and James Hudson his third. Among the negroes thus divided, and which fell to the share of James Hudson, are those which are the subject of this suit. Thus matters stood until 1842, when the old lady,

being again dissatisfied, and it may be, instigated to do so by her sons, Joseph and Jesse Harper, an attempt was made to settle upon her the property which her husband had received.

The attempt was made thus: The settlement of 1836, the stipulations of which I have already stated, was literally copied, and to the copy the following statement appended:

" The above agreement, entered into on the 10th day of Jan. 1836, and signed by the above named parties, and witnessed by the Rev. Samuel Anthony. Witness, we do both agree that the above is a true copy of the original, which is lost or mislaid, and cannot be found."

This statement was signed by James Hudson and Sarah Hudson.

Upon the same paper, and immediately following, is found the following :

"My beloved wife, having (many, some or from,) just causes become afraid that she will be deprived of her just dues and support, out of her property above named, I, James Hudson, do hereby relinquish to her all my claims to her property, as above named, that (may be, was left,) in my hands, and all that part of the stock and household furniture that was hers."

Signed and sealed, this 23d day of April, 1842.

　　　　Signed,　　　　　　　　JAMES HUDSON.

Witnessed by James Hudson, Sen. and Robert W. Walker.

Being proven by R. W. Walker, the foregoing instrument was recorded in Houston County, where the parties lived, in October, 1845.

Subsequently to its execution, James Hudson sold the negroes now sued for, to the plaintiff, for a valuable cosideration. They were delivered to Thomas J. Harper, under a possessory warrant sued out by him as next friend for Mrs. Hudson, against the plaintiff, who subsequently brought this action of trover for

Harper *vs.* Scott.

their recovery, against Joseph Harper, who was thought to be in possession.

The defendant seeks to defeat his recovery, by showing title out of him, and relies upon the instrument of 1842, as a valid settlement of the negroes upon his wife, by James Hudson. Hence the questions made upon the force and effect of that instrument, which I am now to discuss. As the view we take of that instrument, coincides with that taken by Judge *Johnson,* who tried the case, in his instructions to the Jury, I shall not consider separately the instructions asked or his responses to them. The effort of counsel was to relieve the settlement (as they claimed it to be,) of 1842, from the legal consequences which grow out of its being voluntary—the chief of which is, that it is void as against the plaintiff, who was a subsequent purchaser without notice. Much ingenuity was displayed by the learned gentlemen, in getting up a consideration to support it, and thereby to defeat the conclusion that it was a post-nuptial *voluntary* conveyance. To our minds, the plain and sole view to be taken of it is, that it is purely voluntary; and that no title passed under it to Mrs. Hudson, and of course, none to those who claim under her, as against the plaintiff, who bought subsequently. There is no evidence of notice to him, except the record of the instrument, and that we have adjudged to be insufficient. *Fleming vs. Townshend,* 6 *Geo. R.* 103. The instructions asked, were all based upon the idea that a consideration for the settlement of 1842, grew out of the ante-nuptial settlement of 1836. In no way can that settlement be connected with that of 1842. The former was a valid contract, having marriage for its consideration, and there is no doubt but that it would have been a sufficient consideration for a conveyance from the husband to the wife, after the marriage, in pursuance of its provisions. But the fact is, that the contract of 1836, was rescinded, and became for all purposes extinct, by the agreement and division made in 1837. To this agreement, and to the division of the property made in pursuance of it, all the persons interested in the contract of 1836, were parties. It was made by James Hudson, the husband of Mrs. Hudson, the wife,

and Joseph Harper and Jesse Harper, the remainder-men; there was at no time any issue of the marriage; all these persons were *sui juris*; Mrs. Hudson, although under coverture, was competent to alien the separate interest which she held.

And she did by that contract, relinquish the life estate, which by the settlement of 1836, she acquired in the property. She agreed that the property should be equally divided at once, between her husband and her two sons, and it was divided and delivered to them. The legal result was, that the original settlement became extinct, and the title to the negroes vested absolutely and unconditionally in the respective parties. By this agreement, Mr. Hudson acquired the title to the negroes, which he afterwards sold to Scott, the plaintiff in this action. The existing ante-nuptial settlement was a valuable consideration for the agreement of 1837; besides that, there was an actual consideration moving between all the parties. In lieu of the profits which he could make off the property during the life of his wife, Hudson acquired an absolute property in one-third of it; in lieu of the estate in remainder, the Harpers acquired each, the present and absolute property in one-third; and the interest secured to her children, was a sufficient consideration for the relinquishment of the life estate which Mrs. Hudson had in the property. It is not questionable but that all these parties were competent to contract and to dispose of their respective interest, nor does the testimony leave any doubt but that they did in fact contract, and thereby dispose of it. It is true that a Court of Chancery will, when a contract of alienation, by a married woman, of her separate estate, is brought before it, see to it, that no unfair means were used to induce her to dispose of it; it will inspect the transaction closely, and guard vigilantly the rights of the *feme*; and to this effect the presiding Judge charged the Jury. There is not however, any pretence that this transaction was not voluntary and perfectly fair, so far as Mrs. Hudson is concerned; she makes no complaint; indeed the testimony is, that it was entered into at her instance. The plaintiff in error, I may add, does not question but that Mr. Hudson acquired a perfect title to his part of the negroes, including

those which he sold to the plaintiff in the action below.   He con-
tends, as we shall see, that having a title, he settled them, in
1842, upon his wife.   What I am now seeking to show, is that
by the agreement of 1837, the whole of the property embraced
in the settlement of 1836, was legally disposed of and vested in
Hudson and the Harpers.   This being the case, that settlement
was then extinguished ; it became then—is now, and will for-
ever remain—a nullity ; as much a legal nonentity, as if it had
never been made.

In this condition things stood until 1842.   Mrs. Hudson
being dissatisfied again, her husband executed the paper bear-
ing date on the 23d day of April of that year, and which coun-
sel claim as a valid conveyance of the property which he had
received by the agreement and division of 1837.   It is a cu-
riously constructed affair ; it contains, as before set forth, a copy,
first of the ante-nuptial settlement of 1836 ; then a declaration
signed by James Hudson and Sarah Hudson, that the agree-
ment as shown in the copy, was entered into on the 10th day
of January, 1836 ; was signed by them and witnessed by Rev.
Samuel Anthony ; and that they both agree that it is a true
copy of the original, which is lost or mislaid.   Then follows the
relinquishment before copied, signed by Hudson, and attested
by James Hudson, Sen. and R. W. Walker.   Now it is clear to
me, that the copy of the original settlement and the declaration
which the parties make concerning it, are operative for no legal
purpose ; they convey nothing ; relinquish nothing ; contain no
covenants or stipulation of any kind.   The parties exhibit an
old contract, and declare that it was made on a certain day—
attested and signed ; and that the copy is a true copy of the
original, which was lost.   That is their meaning, nothing more
nor less.   If indeed, the old contract had not been annulled by
the agreement of 1837, the exhibition of the copy in connection
with the paper signed by Hudson, might be construed, with some
plausibility, as an attempt to revive in form, a lost contract, and
thus to afford a testimonial of its vitality.   But it does so hap-
pen, that we are instructed by the record, that that lost contract
was solemnly annulled, and the property named in it disposed

of by the division of 1837. They are to be viewed therefore as being in legal effect a meaningless recital—but the resuscitation of a dead carcass. Outside of any legal effect, the statement of these parties, that such a contract did once exist, may be considered as furnishing a motive for the reliquishment in his wife's favor, which Hudson attempts to make. We come then, to the relinquishment itself. It has no connection in its terms, or in its legal effect with what precedes it; it has no relation to it, except that of mechanical juxtaposition; it must stand or fall upon its own isolated merits. What does it purport to do? It relinquishes to his wife, all his claims to her property, which *may* be or *was* left in his hands. The paper being somewhat illegible, it is not certain whether its true reading is *may be* or *was.* The property referred to, is unquestionably that which was embraced in the ante-nuptial settlement, for his wife had none other; one-third of that he acquired in 1837, by the division then made; and as the negroes in controversy, originally belonged to Mrs. Hudson, and came into the possession of Mr. Hudson in 1837, there is no doubt but that the relinquishment embraces them. Whilst in the simplest form of a relinquishment of all his claims to the property, I see no objection to its being considered in the light of a conveyance of it to his wife, or of a settlement of the property upon her. To sustain this conveyance, no consideration is expressed, and none can be inferred. The *reason* assigned for it, is that she had from just causes become afraid that she would be deprived of her just dues and support out of her property. Such fears, although founded on just causes, do not constitute a consideration. Hudson receives nothing; she is not injured; neither a benefit to him, nor a damage to her is disclosed; it is beyond controversy a purely voluntary act. Stripped of the foreign matter thrown about it by the ability of counsel, it stands confessed, a naked volunteer.

[2.] As such, it is void against a subsequent purchaser without notice. It is void by *Statute 27th Elizabeth*, for conveyances of personal property are within the spirit of that Act.

[3.] And if they were not, a voluntary conveyance is void

upon Common Law principles, against purchasers without no-
tice.   *Fleming vs. Townsend,* 6 *Geo. Rep.* 103.

Upon these views, the defendant failed to show a title to the
negroes out of the plaintiff, and as these are the views, in effect,
given by the Court below in charge to the Jury, we can recog-
nize no error in what he did charge, or in his declining to charge
as requested.

[4.] The evidence of the witnesses introduced to prove the
contents of the agreement entered into in 1837, was properly
admitted.   The existence of the paper was proven.   It was ne-
cessary, in order to the admission of secondary evidence, to
prove its contents, to establish a reasonable presumption of its
loss or destruction.   Whether in any case such reasonable pre-
sumption is established, is a question for the Court to deter-
mine.   It is to be held as established when the party shows
that he has exhausted in a reasonable degree, all the sources
of information and means of discovery which the nature of the
case suggests, and which were accessible to him.   *Doe on the
demise of Vaughn vs. Biggers,* 6 *Geo. R.* 188.

In this case, the paper was traced into the possession of
Mrs. Hudson, one of the parties to it.   It was proven that the
trunk which contained the agreement, which I understand to be
the trunk of Mr. Hudson, also a party to the agreement, and
who acquired the property in dispute under it, and under whom
the plaintiff claims, was broken open; and Mrs. Hudson was
heard to say that she had the instrument taken out of the trunk,
and that her husband would never see it again.   She, together
with her papers, went to the house of the defendant, where she
died; and the defendant administered upon her estate.   Notice
was served upon him to produce it.   It was also in evidence by
the son of the plaintiff, that his father was sick; that he did
much of his father's writing, and in the course of his business fre-
quently examined his papers, and had never seen any such paper.
The foundation for the admission of the secondary evidence,
was laid within the rule above stated, and therefore that evi-
dence was legally admitted.

The saying of Mrs. Hudson, that she had had the instrument taken from the trunk, and that her husband would never see it again, was proposed to be proven; and the proof being admitted, the plaintiff in error excepted. . Whether it would be competent to prove the sayings of Mrs. Hudson, upon the trial, as to any point material to the issue, is not the question now. The question is, whether they are proveable, in laying the foundation for the admission of secondary evidence of the contents of a written agreement.. Her sayings in this instance, are not in reference to the contents of the paper, but in reference to her seizure of it, and her determination to withhold or destroy it. She being dead, for this purpose, we think her declarations admissible.

[6.] It seems that after the plaintiff had bought these negroes from Hudson, a possessory warrant was issued against him, by Thomas J. Harper, as next friend of Mrs. Hudson; she setting up a claim to them, under the post-nuptial paper, of 1842. Upon the hearing, the property was delivered to Thomas J. Harper; and he gave bond, as required by the Statute, for the forthcoming of the same, to answer a judgment in favor of the plaintiff in this action. .

[7.] He was called by the defendant in this suit, to prove that the possession was not in the defendant at the time that the plaintiff demanded the negroes. The Court ruled him incompetent, and defendant excepted. We do not doubt but that he was incompetent. Whether a judgment for the plaintiff in this action would, under the Statute, be a judgment against him and his securities on the bond, we do not decide. It is not necessary; he is incompetent from interest. The bond creates a personal liability upon him, to the plaintiff, in the event of a recovery and the non-delivery of the negroes. His testimony is offered to defeat the plaintiff's action. If the plaintiff fails—if there is a judgment for the defendant—the obligation of his bond is cancelled. If plaintiff succeeds, he is not necessarily to become chargeable on his bond; but he may be. He derives a discharge from a judgment against the plaintiff; he is

interested therefore, in the event of the suit, and an incompetent witness.

Jacob N. Goff, with two others, were sureties upon the delivery bond. The defendant moved the Court to substitute another person for Goff, on the bond, with a view to his testimony on the trial. The motion was refused; the Court holding that Goff could not be removed from the bond without the consent of his co-sureties—without discharging them—at the same time deciding that an entirely new bond might be substituted. Defendant excepted. The co-sureties of Goff, have the right to stand upon their contract; their contract was to be bound with Goff, and not with another; it is not enough that a substitute would bring greater pecuniary strength to the bond; they have an interest in the *individual man*; in his character, relations, and position, as well as in his pecuniary responsibility. The Court could do no more than the obligee himself could do in this matter. A discharge of Goff by him, would have discharged the other sureties. For these reasons, the motion of defendant was well denied. 3 *Kelly*, 412. 4 *Geo.* 397. 10 *Geo.* 235.

Let the judgment be affirmed.